IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

CARL MOUTON                                                                                          PETITIONER

5:18CV00306 BSM/PSH

WENDY KELLEY, DIRECTOR,
Arkansas Department of Correction                                                      RESPONDENT

FINDINGS AND RECOMMENDATION

INSTRUCTIONS

The following recommended disposition has been sent to Chief United States District Judge Brian S. Miller. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court Clerk within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

DISPOSITION

Carl Mouton ("Mouton") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Mouton is currently in the custody of the Arkansas Department of Correction (ADC) following 2017 convictions in the Circuit Court of Pulaski County on two counts of sexual assault in the second degree of a minor. Mouton was sentenced to five years' imprisonment on one count and fined $10,000 on the other count. On direct appeal, Mouton alleged his constitutional right to present a defense was violated when the trial court denied his request to present evidence of the sexual nature of the relationship between the victim, K.V., and another minor, E.P. The trial court ruled that Mouton could introduce evidence that K.V. and E.P. were close friends, but could not introduce evidence that they had a prior sexual relationship. The Arkansas Supreme Court affirmed

1

the convictions, finding the trial court's ruling comported with Arkansas Rule of Evidence 411 and did not violate Mouton's right to present a defense. *Mouton v. State*, 2018 Ark. 187, *cert. denied*, 139 S. Ct. 289, 202 L. Ed. 2d 137 (2018). Mouton's petition for writ of certiorari with the United States Supreme Court was denied in October 2018.

In November 2017, Mouton appeared before the Arkansas Parole Board, which deferred a decision on parole until Mouton completed the Reduction of Sexual Victimization Program ("RSVP"). Mouton has opted not to participate in RSVP, alleging that completion of the program requires him to admit his guilt to the charges of which he was convicted.

In November 2018, Mouton filed this habeas corpus petition, alleging the following constitutional errors:

> 1. His right to present a defense was violated by the Arkansas Courts' refusal to permit him to present evidence concerning the nature of the relationship between the accuser and a person who clearly was positioned to be antagonistic to him. Mouton alleges this argument, raised at trial and on direct appeal, has merit because the Arkansas Courts unreasonably interpreted clearly established Supreme Court precedent; and
> 2. The State of Arkansas is penalizing Mouton's exercise of his Fifth Amendment right against self-incrimination by conditioning his parole on completion of RSVP, which requires him to state he is guilty of the offenses.

Respondent Wendy Kelley ("Kelley") has responded, contending the claims are without merit.

**Mouton's First Claim for Relief.**

Mouton and Kelley agree that this claim was adjudicated in state court. When the state court has ruled on the merits of a petitioner's claims, a writ of habeas corpus may not be granted unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(1), (2). The United States Supreme Court offers guidance in

interpreting the statute:

> A state court decision will be "contrary to" our clearly established precedent if the state court either "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." A state court decision will be an "unreasonable application of" our clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."
> . . . Distinguishing between an unreasonable and an incorrect application of federal law, we clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable.

*Penry v. Johnson*, 532 U.S. 782, 792-93 (citations omitted).

Mouton and Kelley also agree on what constitutes the clearly established federal law applicable in this case – *Olden v. Kentucky*, 488 U.S. 227 (1988) (per curiam), *Davis v. Alaska*, 415 U.S. 308 (1974), and *Crane v. Kentucky*, 476 U.S. 683 (1986). These cases all deal with a defendant's constitutional right to present a complete defense. The consensus on whether the claim was adjudicated in state court and on the applicable federal law leaves only one question – was the decision rendered by the Arkansas courts contrary to, or an unreasonable application of, the above-cited cases of the United States Supreme Court?

> The Arkansas Supreme Court's consideration of this issue is the starting point:
>
> Appellant Carl Mouton, was convicted in the Pulaski County Circuit Court of two counts of sexual assault in the second degree. On appeal, Mouton argues that he should have been permitted to present evidence of the sexual nature of the relationship between the victim, KV, and another minor, EP. Mouton argues that the exclusion of this evidence did not comport with Arkansas Rule of Evidence 411, and that the exclusion violated his constitutional right to present a defense. . .
>
>  I. *Background*
>
> Carl Mouton was the band director for Oak Grove High School and then continued to serve as band director after Oak Grove High School became Maumelle High School in 2011. The high school's band program saw great success during Mouton's tenure, which developed an environment where both parents and students alike took pride in the school band and participated in its activities through a booster program.
>
> KV attended Maumelle High School and played in the band from 10th through 12th

3

grade. She graduated early at sixteen years old and was attending classes as a freshman in college at the time of the trial below. KV, like many other students, had a very close and friendly relationship with Mouton. KV and Mouton would regularly hug each other at school and band functions. Beginning in November 2014, KV began a dating relationship with another female student in the band, EP. At some point, KV's and EP's parents found out about their relationship, and they attempted to put an end to it by having KV, EP, and certain school officials sign an agreement that KV and EP would not sit together or hang out together at school unsupervised; however, Mouton did not force the girls to abide by the agreement when they were under his supervision. By the date of the pretrial hearing, May 8, 2017, KV and EP were no longer in a dating relationship.

During this time, EP was living in Little Rock, but she was able to attend Maumelle High School because her mother, Diedre Pippenger, had agreed with another individual, Leonard McKinney, who resided in Maumelle and with whom Pippenger reportedly had a close relationship, to represent to the public that EP was living at McKinney's residence. McKinney was very involved in the band's booster program and has a child of his own who had been in the band.

According to KV's pretrial testimony, during finals week of her sophomore year, KV and Mouton gave each other an end-of-the-year goodbye hug, and Mouton grabbed KV's bottom during their embrace. KV testified that Mouton continued to periodically grab her bottom when the two would hug throughout the remainder of her time at Maumelle High School. She also testified that in May 2015, Mouton pulled her breast out of her shirt and placed his mouth over her breast for approximately 15 seconds. KV reportedly told EP about the incident via text message two weeks later in July 2015 and made EP promise to keep it a secret. No evidence was presented regarding any other communicating or reporting of the incident at the time.

Over the course of the next year, Mouton's relationship with McKinney deteriorated due to disagreements about the management of the band. Mouton eventually "fired" (or was in the process of firing) McKinney from the booster club during the week of May 5–11, 2016. Mouton's and McKinney's disagreements apparently manifested in a "blowup" at a meeting at the school on May 5, 2016, for which both EP and McKinney were present and from which McKinney drove EP home. EP testified that, the next evening, she told her mother about the incident KV had described approximately a year prior. Pippenger herself recalled EP disclosing what KV had said about Mouton the same night McKinney drove her home from the meeting.

Pippenger testified that, for a day or two, she did not do anything in response to EP's disclosure, and she then called McKinney looking for advice. McKinney gave Pippenger the telephone number for the child-abuse "Hot Line," which Pippenger reportedly called a couple of days later. The ensuing investigation led to Mouton being charged with, and later convicted of, two counts of second-degree sexual assault against KV.

II. *Issues on Appeal and Applicable Legal Authority*

4

The issues on appeal stem from the trial court's decisions with respect to two pretrial motions. The first was Mouton's "rape-shield" motion, which sought to introduce evidence of the sexual nature of KV's relationship with EP. The trial court denied this motion, ruling that Mouton could present evidence that KV and EP were close friends, but not evidence of their previous sexual relationship. Mouton appeals this decision, arguing that the evidence should not have been excluded under Rule 411, and that its exclusion violates his constitutional right to present a defense. . .

The general purpose of the rape-shield rule "is to shield victims of rape or sexual abuse from the humiliation of having their personal conduct, unrelated to the charges pending, paraded before the jury and the public when such conduct is irrelevant to the defendant's guilt." *McCoy v. State*, 2010 Ark. 373, at 9, 370 S.W.3d 241, 247. Subsection (b) of Rule 411 identifies several types of evidence that will be inadmissible unless the admissibility of the evidence is established through the procedure and analysis set forth in subsection (c), by showing that the evidence is relevant and that its probative value outweighs its prejudicial or inflammatory effect.

Interpreting these provisions in *Marion v. State*, this court ruled that a defendant can present to the jury evidence of a victim's prior sexual conduct that would otherwise be prohibited by the rape-shield rule if the defendant can establish a legitimate "evidentiary hypothesis underpinned by a sufficient statement of facts." 267 Ark. 345, 348–49, 590 S.W.2d 288, 290 (1979). There, the defendant was charged with rape, and he filed a pretrial motion for an in camera hearing to determine the admissibility of the victim's prior sexual conduct. *Id.* at 346, 590 S.W.2d at 289. The trial court denied the defendant's motion, and the defendant then brought an interlocutory appeal of the trial court's decision to deny his motion. *Id.* This court made two important observations. First, with respect to the defendant's argument that the proffered evidence should have been admissible pursuant to the procedure and analysis set forth in subsection (c) of the rape-shield rule, this court held as follows:

> Appellant's defense to the rape charge was that no sexual intercourse occurred between them on the alleged occasion. He proffered evidence that the charge against him was made by the prosecutrix because of a fight they had as a result of his contracting a venereal disease from her. At the time of the fight, she threatened "she would get even with him." Consequently, the present charge resulted. We cannot agree with the court's exclusion of this proffered evidence. Certainly, upon sufficient proffer as here, the victim's bias, prejudice or ulterior motive for filing the charge is relevant or germane to the question of whether the alleged act of sexual intercourse actually occurred and the probative value outweighs its inflammatory or prejudicial nature.

*Id.* at 348, 590 S.W.2d at 290. Accordingly, this court held that the evidence should have been admitted pursuant to the procedure and analysis set forth in subsection (c) of the rape-shield rule.

The *Marion* court also acknowledged the defendant's second argument, that the trial

5

court's application of the rape-shield rule to the evidence in question violated the defendant's constitutional right to confront the witnesses against him.

> [A]ppellant's counsel was denied effective cross-examination of a constitutional magnitude when he, after stating an evidentiary hypothesis underpinned by a sufficient statement of facts, was refused the right to reveal possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand[.]

*Id.* at 348–49, 590 S.W.2d at 290 (internal quotations omitted). Accordingly, this court held that excluding the evidence of bias and motivation to lie violated the defendant's constitutional right to confront the witnesses against him.

Mouton also cites several United States Supreme Court cases in support of his argument that the trial court's application of the rape-shield rule violated his constitutional right to present a defense. He points to *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), where the Supreme Court held:

> Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi*, *supra*, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, *Washington v. Texas*, 388 U.S. 14, 23 [87 S.Ct. 1920, 18 L.Ed.2d 1019] (1967); *Davis v. Alaska*, 415 U.S. 308 [94 S.Ct. 1105, 39 L.Ed.2d 347] (1974), the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S., at 485 [104 S.Ct. 2528]; cf. *Strickland v. Washington*, 466 U.S. 668, 684 685 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment"). We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. *In re Oliver*, 333 U.S. 257, 273 [68 S.Ct. 499, 92 L.Ed. 682] (1948); *Grannis v. Ordean*, 234 U.S. 385, 394 [34 S.Ct. 779, 58 L.Ed. 1363] (1914).

476 U.S. at 690, 106 S.Ct. 2142. Mouton also directs our attention to *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and *Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988), cases in which the Court has emphasized the importance of the defendant's ability to cross-examine the witnesses testifying against him. In *Davis*, a burglary case in which the trial court prevented the defendant from using the fact that a witness was on juvenile probation for burglary to impeach that same witness, the Supreme Court stated:

> On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness ... On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences

6

> relating to the reliability of the witness. Petitioner was thus denied the right of effective cross-examination which would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.

415 U.S. at 318, 94 S.Ct. 1105 (emphasis added).

*Olden* is also instructive. There, James Olden and Charlie Ray Harris, both of whom were black, were indicted for kidnapping, rape, and forcible sodomy. 488 U.S. at 228, 109 S.Ct. 480. The alleged victim, Starla Matthews, had traveled with her friend to Princeton, Kentucky, to exchange Christmas gifts with Bill Russell, Olden's half-brother. *Id.* After exchanging gifts with Russell at a car wash, Matthews went with her friend to a local bar. *Id.* Much of the remaining facts were in dispute, but the gist is that Matthews left the bar with Olden and Harris in Harris's vehicle, and Olden and Matthews engaged in sexual intercourse multiple times over the remainder of the evening. *Id.* at 228–29, 109 S.Ct. 480. Olden asserted that Matthews had propositioned him and that the sex was entirely consensual; Matthews asserted that the sex was nonconsensual and that Harris had assisted Olden by holding Matthews's arms. *Id.* Afterward, Olden and Harris drove Matthews back to Russell's house, dropped Matthews off, and drove away. *Id.* at 229–30, 109 S.Ct. 480. When Russell met Matthews at the door as she approached Russell's house, Matthews told Russell that she had just been raped by Olden and Harris. *Id.*

At trial, Olden sought to introduce evidence of the fact that Matthews was living with Russell in an effort to show Matthews's motivation to fabricate the allegations. *Id.* at 230, 109 S.Ct. 480. The Court observed,

> Although Matthews and Russell were both married to and living with other people at the time of the incident, they were apparently involved in an extramarital relationship. By the time of trial the two were living together, having separated from their respective spouses. Petitioner's theory of the case was that Matthews concocted the rape story to protect her relationship with Russell, who would have grown suspicious upon seeing her disembark from Harris' car. In order to demonstrate Matthews' motive to lie, it was crucial, petitioner contended, that he be allowed to introduce evidence of Matthews' and Russell's current cohabitation. Over petitioner's vehement objections, the trial court nonetheless granted the prosecutor's motion in limine to keep all evidence of Matthews' and Russell's living arrangement from the jury. Moreover, when the defense attempted to cross-examine Matthews about her living arrangements, after she had claimed during direct examination that she was living with her mother, the trial court sustained the prosecutor's objection.

*Id.* at 229–30, 109 S.Ct. 480. The jury acquitted Harris of all charges and acquitted Olden of kidnapping and rape, but "in a somewhat puzzling turn of events," the jury convicted Olden of forcible sodomy and sentenced him to ten years in prison. *Id.* at 230, 109 S.Ct. 480. Olden appealed, arguing that the trial court's decision violated his constitutional right to be confronted with the witnesses against him. *Id.*

The Supreme Court reversed, ruling that the trial court's restriction upon Olden's ability to cross-examine Matthews violated Olden's Sixth Amendment rights. *Id.* at

231, 109 S.Ct. 480. The Court noted,

> The Kentucky Court of Appeals did not dispute, and indeed acknowledged, the relevance of the impeachment evidence. Nonetheless, without acknowledging the significance of, or even adverting to, petitioner's constitutional right to confrontation, the court held that petitioner's right to effective cross-examination was outweighed by the danger that revealing Matthews' interracial relationship would prejudice the jury against her. While a trial court may, of course, impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such factors as "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant," *Delaware v. Van Arsdall, supra*, [475 U.S. 673] at 679, 106 S.Ct. [1431] at 1435 [89 L.Ed.2d 674 (1986) ], the limitation here was beyond reason. Speculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of Matthews' testimony.

*Id.* at 232, 109 S.Ct. 480. The Court then added that "a constitutionally improper denial of a defendant's opportunity to impeach a witness for bias" must be reversed unless the appellate court finds that the error was harmless beyond a reasonable doubt, based upon factors including "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* at 232–33, 109 S.Ct. 480 (*referencing Van Arsdall*, *supra*, and *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ). Applying those factors to Olden's case, the Court reasoned,

> Here, Matthews' testimony was central, indeed crucial, to the prosecution's case. Her story, which was directly contradicted by that of petitioner and Harris, was corroborated only by the largely derivative testimony of Russell, whose impartiality would also have been somewhat impugned by revelation of his relationship with Matthews. Finally, as demonstrated graphically by the jury's verdicts, which cannot be squared with the State's theory of the alleged crime, and by Judge Clayton's dissenting opinion below, the State's case against petitioner was far from overwhelming. In sum, considering the relevant *Van Arsdall* factors within the context of this case, we find it impossible to conclude "beyond a reasonable doubt" that the restriction on petitioner's right to confrontation was harmless.

*Olden*, 488 U.S. at 233, 109 S.Ct. 480. . .

IV. *Analysis: Constitutional Right to Present a Complete Defense*

We now address whether the trial court's application of Rule 411 to exclude the evidence in question violated Mouton's constitutional right to present a complete defense. A trial in which a constitutional error occurred must be reversed unless the

reviewing court finds the error harmless beyond a reasonable doubt. *See Olden*, *supra*; *Chapman, supra.* We conclude that the trial court's decision in this case did not violate Mouton's constitutional right to present a complete defense.

While a defendant certainly has a constitutional right to present a complete defense at trial, it does not follow that any and all evidentiary exclusions adverse to the defendant will constitute a violation of that right. The Supreme Court has noted,

> "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (*quoting California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) ), but we have also recognized that "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (*quoting United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) ). Only rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. *See* 547 U.S., at 331, 126 S.Ct. 1727 (rule did not rationally serve any discernible purpose); *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (rule arbitrary); *Chambers v. Mississippi*, 410 U.S. 284, 302–303, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (State did not even attempt to explain the reason for its rule); *Washington v. Texas*, 388 U.S. 14, 22, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (rule could not be rationally defended).

*Nevada v. Jackson*, 569 U.S. 505, 509, 133 S.Ct. 1990, 186 L.Ed.2d 62 (2013).

While it may not always be stated in identical terms, a consistent theme in the cases from both the Arkansas Supreme Court and the United States Supreme Court addressing the constitutional right to present a complete defense is that a defendant's ability to verbally cross-examine the witnesses presented against him will not be impeded, provided that the cross-examination pursues an evidentiary hypothesis underpinned by sufficient supporting facts. *See, e.g.*, *Davis*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (defendant's theory was that complaining witness identified defendant as the burglar because complaining witness was afraid that authorities thought he was the actual burglar and wanted to divert suspicion; prosecution presented no evidence to foreclose defendant's theory); *Olden*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (defendant's theory was that victim levied rape accusation against defendant to discourage third party from ending his romantic relationship with victim after she had consensual sex with defendant; prosecution presented no evidence to foreclose defendant's theory); *Marion*, 267 Ark. 345, 590 S.W.2d 288 (defendant's theory was that victim levied rape accusation against defendant in retaliation for fight over defendant contracting venereal disease from victim; prosecution presented no evidence to foreclose defendant's theory). Furthermore, we are guided by our ruling in *Marion*, that

> [t]he offer of proof [in support of introducing rape-shield evidence to the jury] need not be stated with complete precision or in unnecessary

9

> detail but it should state an evidentiary hypothesis underpinned by a sufficient statement of facts to warrant the conclusion or inference that the trier of fact is urged to adopt (,) .... (and) it ought to enable a reviewing court to act with reasonable confidence that the evidentiary hypothesis can be sustained and is not merely an enthusiastic advocate's overstated assumption.
>
> *Marion*, 267 Ark. at 349, 590 S.W.2d at 290.
>
> Applying these principles to the case at hand, the trial court's exclusion of evidence of the sexual nature of KV's and EP's relationship did not violate Mouton's right to present a complete defense.
>
> Mouton's theory was that the allegations against him were fabricated by McKinney, Pippenger, EP, and KV in retaliation after Mouton fired McKinney. Mouton argues that evidence of the sexual nature of KV's relationship with EP was necessary to show the extent to which KV was aligned with EP's interests. The State argues that the timeline of Mouton's theory is fatally flawed in terms of when the allegation was first made and when it was first reported to authorities. Pippenger reported the allegations to authorities when EP disclosed them to her after the Mouton–McKinney blowup, and EP had no contact with KV between learning about the blowup and disclosing the allegations to Pippenger. EP already knew of the allegations from when KV revealed them to her approximately one year prior. The State argues, therefore, that Mouton's theory (that the allegations were a fabricated retaliation for McKinney's firing) would garner no factual support from any sexually related bias between KV and EP since the motivation for the alleged McKinney–Pippenger–EP–KV alliance to retaliate did not exist until approximately one year after KV had disclosed the allegations to EP. In response, Mouton argues that the very notion that KV had previously disclosed the allegations to EP could be another made-up component of the McKinney–Pippenger–EP–KV alliance's retaliation.
>
> This is where Mouton's evidentiary basis for probing into KV's and EP's past sexual relationship at trial fails. All the evidence in the record before us supports the conclusion that KV disclosed the allegations to EP while the two were dating, several months before the Mouton–McKinney blowup. The only actual evidence in the entire record that could suggest that this prior disclosure was never made is Mouton's testimony *at trial* generally denying that anything improper ever occurred between him and KV. This no more supplies "an evidentiary hypothesis underpinned by sufficient supporting facts" than would Mouton's plea of "not guilty," and it is therefore insufficient to establish a constitutional violation. Accordingly, Mouton's constitutional right to present a complete defense was not violated, *Chapman's* harmless-beyond-a-reasonable-doubt standard of review has not been triggered, and the trial court's decision on this question is affirmed.

*Mouton v. State*, 2018 Ark. 187, 1-4, 6-12, and 15–18, *cert. denied*, 139 S. Ct. 289, 202 L. Ed. 2d 137 (2018). Two concurring opinions were issued. Chief Justice John Dan Kemp opined that the relationship between K.V. and E.P. was irrelevant and therefore inadmissible. Justice Karen R.

Baker also wrote a concurring opinion, agreeing with Chief Justice Kemp that the prior sexual relationship was not relevant. Justices Wood and Wynne joined in Justice Baker's concurrence. The alignment of the various justices reflects a unanimous decision on the result, but a split decision on the rationale. Two justices joined in the opinion of Justice Hart, who found Mouton's right to present a complete defense was not violated because the trial court rightly excluded the evidence of the sexual nature of K.P. and E.P.'s relationship. Justice Hart's opinion assumed the evidence of the sexual relationship might have been relevant, but found it nevertheless was properly excluded because there was not an adequate evidentiary hypothesis warranting its inclusion. Four justices opined the evidence of the sexual relationship was simply not relevant. We will analyze the state court decisions, first addressing whether Justice Hart's decision unreasonably applied clearly established federal law. Then, in the alternative, we will address whether the opinions of the four justices who deemed the evidence irrelevant was an unreasonable application of clearly established federal law.

**Analysis: Federal Law and Justice Hart's Opinion**

Justice Hart, after citing the clearly established federal law, found that Mouton's right to present a complete defense was not impeded. This finding rested upon the absence of a factual basis to support Mouton's theory that McKinney, Pippenger, K.V., and E.P. conspired to fabricate the charges against him at the time McKinney was "fired" from his role with the band supporters. The testimony that K.V. had disclosed the conduct of Mouton to E.V. months prior to the "firing" of McKinney is inconsistent with Mouton's theory. So, Mouton's theory of the case was, in fact, very theoretical, in that it was contrary to the evidence adduced at trial. As a result, Justice Hart found that Mouton failed to articulate "an evidentiary hypothesis underpinned by sufficient supporting facts" necessary to admit the evidence of a sexual relationship. *Mouton v. State*, 2018 Ark. 187, at 18. This was a reasonable application of clearly established federal law. Mouton fails to show that

11

the relevant cases dictate a different conclusion. To the contrary, the pertinent cases require the trial judge to assess the nature of the evidence a defendant wishes to introduce. Here, the trial judge did precisely this. Docket entry no. 8 (this is a transcript, filed under seal, of the hearing on Mouton's motion to admit evidence of other sexual conduct). We find no error in the ruling of the trial judge, or in the decision of Justice Hart to affirm the trial court. It follows that there is no merit to the claim that the Arkansas courts unreasonably applied the relevant federal law.

### Analysis: Federal Law and the Opinion that the Evidence was Irrelevant:

Four Arkansas Supreme Court Justices agreed that the evidence of the sexual relationship of K.V. and E.P. should have been excluded because it was not relevant. Only brief analysis is necessary, as Mouton does not allege any clearly established federal precedent that would support the notion that irrelevant evidence is admissible. Mouton's sole argument is that Justice Hart's analysis was an unreasonable application of clearly established federal law. Even if Mouton had advanced an argument targeting the Arkansas appellate court's finding of irrelevance, such an argument is clearly without merit. Mouton had no right to introduce irrelevant evidence. *See, e.g., Jackson v. Norris*, 651 F.3d 923, 926 (8th Cir. 2011) ("Jackson's constitutional right to present a defense was not impaired, because that right does not extend to the introduction of irrelevant evidence.").

### Summary of Mouton's First Claim for Relief:

There is no merit to Mouton's first claim for relief. Regardless of the view taken of the decision rendered by the Arkansas Supreme Court, Mouton fails to demonstrate that the state courts' decision was an unreasonable application of clearly established federal law.

### Mouton's Second Claim for Relief:

Mouton alleges the State of Arkansas is penalizing his exercise of his Fifth Amendment right

against self-incrimination by conditioning his parole on the completion of RSVP, which requires him to state he is guilty of the charges of which he was convicted. Mouton and Kelley disagree on what is required by RSVP[1] – Mouton alleges he is required to admit his guilt to the crimes for which he was convicted, while Kelley contends the bar is set lower than such an admission. Kelley quotes from the Resident Handbook, which requires participants to "accept responsibility for . . . negative behavior[,]" "to take ownership for offending[,]" and to '[e]nd all forms of denial." Petition at pages, 20, 23-25. Kelley also notes the RSVP Treatment Agreement requires a participant to "be completely honest and assume responsibility for offenses and behavior." Docket entry no. 6-9.

Since we find Mouton's second claim is without merit based upon other considerations, we need not and do not address whether he is being asked to admit his guilt to the crimes of which he was convicted.

**Analysis of Mouton's Second Claim for Relief:**

The Fifth Amendment of the Constitution provides no person "shall be compelled in any criminal case to be a witness against himself." Although this language appears to settle the dispute, since it is conceded that RSVP is not a criminal proceeding, we find further guidance from United States Supreme Court. The parties agree that *McKune v. Lile*, 536 U.S. 24 (2002), and specifically the concurring opinion authored by Justice O'Connor in this 4-1-4 plurality decision, controls[2] this case.

In *McKune*, a Kansas inmate was deemed ineligible to continue in a sexual treatment program because he would not admit to uncharged criminal conduct. As a result, his privileges were reduced and he was transferred to a higher security housing unit. Those specific hardships suffered

---

[1]Mouton attaches the Resident Handbook providing guidelines for inmate conduct in the RSVP program. Petition, pages 17-30.

[2]When no one view is adopted by a majority of the Justices the holding of the Court is the position taken by those Justices who concurred in the judgment on the narrowest grounds. *Marks v. United States*, 430 US. 188 (1977).

by McKune were held not to rise to the necessary level of compulsion to be violative of the Fifth Amendment. Four Justices noted that the result might be different if McKune's removal from the treatment program "affected his eligibility for parole or good time credits." 536 U.S. at 38. Justice O'Connor wrote:

> I believe the proper theory should recognize that it is generally acceptable to impose the risk of punishment, however great, so long as the actual imposition of such punishment is accomplished through a fair criminal process. See, *e.g., McGautha v. California, supra,* at 213, 91 S.Ct. 1454 ("The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose" (citation and internal quotation marks omitted)). Forcing defendants to accept such consequences seems to me very different from imposing penalties for the refusal to incriminate oneself that go beyond the criminal process and appear, starkly, as government attempts to compel testimony; in the latter context, any penalty that is capable of compelling a person to be a witness against himself is illegitimate.

*McKune v. Lile*, 536 U.S. 24, 53 (2002).

In the years since the *McKune* decision, the Eighth Circuit Court of Appeals[3] has not addressed the issue raised by Mouton – whether the state's deferral of consideration for parole constitutes sufficient compulsion to allow Mouton to invoke his Fifth Amendment right against self-incrimination. Other Circuit Courts, however, have considered this issue and we rely upon the rationale of these courts in concluding that Mouton's Fifth Amendment rights are not violated in this instance.

---

[3] In *Entzi v. Redman*, 485 F.3d 998 (8th Cir. 2007), the Eighth Circuit Court of Appeals considered a scenario somewhat akin to Mouton's. Entzi, convicted of gross sexual imposition, refused to comply with a North Dakota order that he report to the "Sex Offender Education Class" as a condition of probation. Just prior to release from prison, Entzi's probation officer filed a petition to revoke his probation for failure to complete the sex offender treatment. Entzi, who claimed innocence to the crime, contended that requiring him to attend the class amounted to compelling him to be a witness against himself. Significantly, the petition to revoke his probation due to his failure to attend the class was denied. As a result, the impact of the filing of the petition to revoke was "not nearly so great as to constitute compulsion for purposes of the self-incrimination clause of the Fifth Amendment." *Id.* at 1002.

The United States Court of Appeals, First Circuit, considered if the consequences of failing to voluntarily participate in New Hampshire's sexual treatment program impermissibly encumbered the constitutional right not to incriminate oneself. *Ainsworth v. Stanley*, 317 F.3d 1 (1st Cir. 2002). As in *McKune*, nonparticipation in the treatment program could result in transfer to less desirable housing. Significantly, and unlike in *McKune*, nonparticipation in New Hampshire's program "almost always" resulted in the denial of parole. *Id.* at 3. The Circuit Court found New Hampshire had a valid governmental interest in establishing its rehabilitation program, and further found the burden on inmates to admit to their crimes was not unreasonable. A key to the Court's finding was that New Hampshire inmates had no right to parole. Since there was no right to parole, the denial of parole was not a new or additional penalty to the sentence originally imposed. Ultimately, the Court found the inmates' right against self-incrimination was not violated by the sexual treatment program and its requirement that they admit to past conduct.

Mouton, like the New Hampshire inmates, has no right to parole as an Arkansas inmate. The Arkansas Parole Board has broad discretion, with minimal substantive limitations, in matters of parole eligibility, and Arkansas statutes do not create a protected liberty interest in parole. *Morris v. State*, 333 Ark. 466 (1998); *Hamilton v. Brownlee*, 237 Fed.Appx. 114 (8th Cir. 2007).

The Third Circuit Court of Appeals, in *Roman v. DiGugielmo*, 675 F.3d 204 (3rd Cir. 2012), examined *McKune* in depth as it considered Roman's Fifth Amendment claim. In that case, the Pennsylvania Board of Probation and Parole repeatedly denied Roman parole due to his refusal to participate in the sex offender rehabilitation program. That Court observed the following three conclusions were "abundantly clear." *Id.* at 213. First, a state treatment program requiring an inmate to incriminate himself solely for the purpose of gathering incriminating information against the inmate would be unconstitutional. Second, if the penalty for not participating in the program amounted to an atypical and significant hardship on the inmate's prison conditions, the penalty

15

would violate the Fifth Amendment. And third, some penalties which are short of atypical and significant hardships are sufficient to constitute compulsion. For example, penalties "that strike at the core of an inmate's recognized entitlements, that threaten his bodily safety, or that impose additional punishment beyond that already imposed by fair judicial process" would be impermissible under the Fifth Amendment. *Id.* at 214. Guided by those three principles, the Court denied Roman's claim, finding the repeated denial of parole for refusing to participate in the sex offender rehabilitation program was not a Fifth Amendment violation. The Court explicitly found that Roman had no right or entitlement to parole under Pennsylvania law, and his sentence was not lengthened or his actual conditions of confinement altered. The refusal of parole was, according to the Court, a consequence that "flowed naturally from his decision not to participate in an established prison program designed to further Pennsylvania's legitimate interest in rehabilitating inmates. . . " *Id.* at 215. *See, also, Searcy v. Simmons*, 299 F.3d 1220 (10th Cir. 2002) (the penalty for refusing to complete the sex offender treatment program, the lost opportunity to earn future good time credits, was not a new penalty but the withholding of a benefit the state was under no obligation to provide).

Even if we assume that Mouton must admit to his guilt to participate in the RSVP program, it does not follow that his Fifth Amendment right against self-incrimination was violated when his parole hearing was deferred due to his refusal to participate in the program. Like the inmates in New Hampshire, Pennsylvania, and Kansas, Mouton has no right to parole. Parole is discretionary in Arkansas, and its denial or deferment does not extend Mouton's sentence or subject him to more punishment than imposed following his trial. A consequence of Mouton's choice not to participate in RSVP program is his deferral from being considered for parole. This consequence is not serious enough to amount to self-incrimination under the Fifth Amendment.

**Summary of Mouton's Second Claim for Relief:**

For the reasons stated herein, Mouton's second claim for relief is without merit.

**Conclusion:**

There is no merit to the claims brought by Mouton. Accordingly, we recommend the petition for writ of habeas corpus be dismissed and the relief requested be denied.

Pursuant to 28 U.S.C. § 2253 and Rule 11 of the Rules Governing Section 2554 Cases in the United States District Court, the Court must determine whether to issue a certificate of appealability in the final order. In § 2254 cases, a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(1)-(2). The Court finds no issue on which petitioner has made a substantial showing of a denial of a constitutional right. Thus, we recommend the certificate of appealability be denied.

IT IS SO ORDERED this 18th day of March, 2019.

_____
UNITED STATES MAGISTRATE JUDGE